PUBLIC SERVICE COMPANY OF INDIANA, INC. *v.*
DEARK, ADMINISTRATRIX

[No. 17,952.   Filed June 6, 1950.]

Royse, C. J., and Wiltrout, J., not participating.

*William P. Evans* and *Owen S. Boling,* both of Indianapolis; and *Bulliet & Orbison,* of New Albany, for appellant.

*Prentice & Prentice,* of Jeffersonville, and *Robert R. Kelso,* of New Albany, for appellee.

BOWEN, J.—This is an appeal from a judgment for damages for the wrongful death of appellee's decedent, which was allegedly caused by appellant's negligence. Issues were joined on appellee's third amended complaint to which a demurrer was addressed and overruled, and by appellant's answer of special denial. The cause was tried by a jury and at the close of all of the evidence, appellant moved for a directed verdict which was overruled, the jury returned a verdict for the plaintiff, and judgment was rendered thereon in appellee's favor for damages in the sum of $7,750.

From an examination of the record, upon a basis of the evidence most favorable to appellee, the following facts appear: The appellant owned and operated an electric power transmission line running in a northerly direction between Jeffersonville and Utica, Indiana, and such line extended for a number of miles northward from Utica along and parallel to the Ohio River. The line carried 2,300 volts and extending from Utica north it was increased to 6,900 volts. The 6,900 volt line was carried on poles 25 feet above the ground and the live wire was attached to the top of the poles by pole-pins, and the neutral wire was attached by clevices

about 30 inches below the live wire. The energized wire was not covered by mechanical insulation, but the construction of the poles and the wires used were in compliance with the recommendations of the National Electrical Safety Code as promulgated by the National Bureau of Standards of the Department of Commerce.

The Town of Utica, its inhabitants, churches, and schools were served off of the 2,300 volt line. The 6,900 volt line served the Conservation Club, its caretakers, some summer camps and a number of other permanent residents. There were telephone poles on the left side of the highway going north, electric poles on the right, and a number of trees on both sides of the highway.

During the month of March, 1945, the territory in question was visited by the second highest flood in the history of the Ohio River, and a greater part of the Town of Utica was inundated. The flood waters extended for several miles beyond the banks of the river and inundated the Utica Pike to a depth of 18 feet. The crest of the flood was reached about March 9th.

For several days plaintiff's decedent's house had been under the flood waters, and he could not get to his regular work, and he had been staying at the home of a relative which was on higher ground. In the afternoon of March 9, 1945, with the flood conditions existing as hereinbefore described, the plaintiff's decedent and his son, who was 14 years of age, started out in a small flat bottom rowboat to search for and appropriate "drift," articles of property floating down the river. The evidence disclosed that there were 40 or 50 boats in the Town of Utica; that most families living there had a boat, and that nearly half of the people in the town engaged in salvaging during floods and searched for "drift."

On the day in question, the plaintiff's decedent and his son went up north along the river in the small rowboat, and used the open space between appellant's distribution line and the telephone line over the waters covering the Utica Pike. A garage had been carried down in the flood waters to a point in the Utica Pike about a mile north of Utica and it there became lodged against appellant's utility pole. On said afternoon when plaintiff's decedent and his son in such rowboat reached a point about 400 feet north of the pole against which the garage was lodged, they anchored by holding on to the branches of tree tops until they sighted a metal oil barrel or drum floating by, which they captured and started to shore with it, the decedent sitting in the boat holding the barrel in his hands in the front of the boat. They passed under appellant's electric power line turning toward shore, and finding the bank at that point too steep and the barrel too heavy, they then followed the high ground down, along and above the public highway on the water in order that they might reach a lower landing. When they reached the point where the garage was lodged they could not get through on the waters over the public highway, and they went out into the river again in order to get around the garage, and again passed under appellant's power line, and came down the river about 100 feet and then again headed in toward the pike and the power line. The son was rowing the boat, and as they came in from the river, he was sitting facing the river. The decedent was sitting in the front of the boat facing the power line, and holding the barrel in front of the boat with his hands. Decedent's son testified that when they reached appellant's power line he saw a flash reflection in the water followed by "a fizzing—a buzzing noise," and he looked around and decedent was in the water. The son caught hold of him with one hand,

and held on until a Mr. Broy, who was about 50 feet away, going out in the river, came to his rescue.

There is evidence that at the time of the accident, appellant's power line was under water. As the garage which was lodged against appellant's pole would arise and sink, it would cause the pole against which it was lodged to lean, and the wire south of the pole would go in and out of the water. There was evidence of tests made that the line would be de-energized after two seconds of being under water. However, there was evidence that the lines were energized and under water at the time of the accident.

Decedent was placed in a boat after the accident and was taken to the home of a Mr. Lewis, where he was found to have burns on his hands, a large burn on his back, and a severe burn on his right ankle. He was attended by a doctor, and was then taken to a hospital where he remained three or four days, and he was then returned to his temporary home of his relative. The doctor continued to treat him until his death on June 8, 1945. About 10 days before his death, his doctor discovered indications of tetanus infection and decedent was hospitalized and a specialist called, but he failed to respond to treatment and died.

One of the assignments of error is that the court erred in overruling appellant's motion for a new trial, the grounds of which motion included specification 6, that the court erred in giving plaintiff's (appellee's) requested instruction No. 3 over the objection of the defendant (appellant). Such instruction reads as follows:

"No. 3 The Jury is instructed that Section 20-304 of Burns' Indiana Statutes Annotated, insofar as it applies to this case, reads as follows: 'It is hereby made the duty of all owners, contractors, subcontractors, corporations, agents or persons what-

soever engaged in . . . the transmission, generation or use of any electricity or other power . . . to see and to require that all . . . wires . . . all contrivances, and everything whatsoever used therein, are carefully selected, inspected and tested so as to detect and exclude defects and dangerous conditions, and that all . . . contrivances used are amply, adequately and properly constructed . . . and that they are properly and safely used, operated, handled and maintained . . . and that in the transmission and use of electricity of a dangerous voltage, full and complete insulation shall be provided at all points where the public . . . are liable to come into contact with the wire or wires . . . and the arms or supports bearing live wires are especially designated and distinguished by a color or other designation which is instantly apparent, and that live electrical wires carrying a dangerous voltage are strung at such distance from the poles or supports as to permit repair men to freely engage in their work without danger of shock; and, generally it shall be the duty of all owners, managers, operators, contractors, subcontractors, and all other persons having charge of, or responsible for, any work, mechanism, machinery, appliance, building, factory, plant, means, employment or business of whatsoever nature, involving risk or danger to employees, or to the public to use every device, care and precaution which it is practicable and possible to use for the protection and safety of life, limb, and health, limited only by the necessity for preserving the reasonable efficiency of such structure, ways, work, plant, building, factory, elevator, cars, engines, machinery, appliances, apparatus or other device or materials, without regard to additional cost of suitable materials or safety appliances, or safe conditions or operations, the first concern being safety to life, limb, and health.' This statute was enacted for the protection of the public generally, and if you find, from a fair preponderance of the evidence, that defendant failed to comply with the provisions of this statute, and that, by reason of such failure, plaintiff's decedent was injured, he being at said time and place free from contributory negligence, then

the Court instructs you that defendant's failure to so comply with said statute constituted negligence."

Appellant's objections to such instructions were, (1) that such instructions quoted in part do no more than declare the common law insofar as the condition and circumstances, as shown by the uncontradicted evidence, and therefore such statute as such has no effect in determining the liability of the defendant; (2) that the uncontradicted evidence shows that defendant did not owe any duty to plaintiff's decedent by virtue of such statute except as said section is declaratory of the common law, and that such instruction No. 3 ignores such fact and instructs the jury that defendant would be guilty of negligence if the jury should find that defendant failed to comply with the provisions of such statute, and does not predicate defendant's liability upon its failure to exercise that degree of care which a reasonable and prudent person or company should have exercised under the circumstances; (3) that the uncontradicted evidence shows that plaintiff's decedent was not within the protection of the provision of such statute, and therefore it is error to instruct the jury that it may determine whether defendant is liable by a consideration of whether or not defendant violated any of the provisions of said Section; (4) that said plaintiff's instruction No. 3 was further erroneous for the reason that it failed to limit the duty of the defendant to such person or persons or class of persons as defendant might reasonably anticipate would be exposed to the danger and to the hazard complained of in plaintiff's third amended complaint.

Such objections question the applicability of such statute in determining the liability of the appellant.

While appellant's complaint alleges a violation of such statute, when we consider the complaint as a whole and the evidence, it must be said that such complaint and the evidence does not disclose that a question was presented to the jury whether appellant company had violated such statute in the construction of its wires and poles, or by their manner of maintenance under ordinary and normal circumstances. The evidence was undisputed that the appellant had not violated the statute as to the construction of its wires or by their manner of maintenance under ordinary and normal circumstances.

Fairly considered, the complaint and the evidence presents the question whether the statute was meant to apply to circumstances arising as the ultimate result of an act of God and culminating in very abnormal flood conditions. Any claim of violation of such statute must arise by reason of the claim that the appellant company failed to properly adjust its facilities to such flood conditions and such failure must be interpreted as included within the provisions of such statute. It is not reasonable nor proper for this court to enlarge the statutory liability of the appellant under such circumstances, and to do so would clearly amount to judicial legislation.

The instruction in question, No. 3, was not applicable to the issues and the evidence and should not have been given the effect as set forth in the instruction in determining the liability of the appellant.

The propriety of an instruction is to be determined, not by whether it embodies a correct statement of the law upon a given state of facts, but whether it correctly states the law relevant to the issuable facts given in the evidence of the trial. *Indiana Ry. Co.* v. *Maurer* (1903), 160 Ind. 25, 66 N. E. 156;

*Fields* v. *Hahn* (1944), 115 Ind. App. 365, 57 N. E. 2d 955.

In considering the effect of an erroneous instruction, we must assume that the error influenced the result, unless it appears from the evidence, or by some part of the record, such error did not affect the result, and that the verdict under proper instructions could not have been different. *City of Decatur* v. *Eady* (1917), 186 Ind. 205, 115 N. E. 577; *Probst, Receiver* v. *Spitznagle* (1938), 215 Ind. 402, 19 N. E. 2d 263.

Applying the foregoing rule to the record and the evidence in the instant case, it is apparent that the evidence showing acts of the appellant in permitting the power line to remain energized with a high voltage of electricity beneath or near the flood waters, and in failing to cut off the current under the circumstances presented a prima facie case of liability for common law negligence against the appellant. However, such prima facie case was challenged by the appellant's evidence and claim of alleged due care under the circumstances. Therefore, an issue of fact was presented to the jury on the question of common law negligence, and it could not be said that common law negligence and liability of appellant appeared from the record and the evidence as a matter of law. Consequently, it cannot be said that such erroneous instruction as to the statutory liability of the appellant could not have affected the result, and it must be presumed that such instruction was harmful. *City of Decatur* v. *Eady, supra.*

By reason of such erroneous instruction, the case to that extent was tried on an improper legal definition of the duty owed by the appellant under the circumstances, and justice was not done.

For the reasons given herein, the court erred in overruling appellant's motion for a new trial. Judgment is reversed with instructions to sustain appellant's motion for a new trial.

Judge Royse and Judge Wiltrout not participating.

NOTE.—Reported in 92 N. E. 2d 723.